United States District Court
Southern District of Texas
**ENTERED**
April 01, 2025
Nathan Ochsner, Clerk

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| ALEXANDRA DEGOLLADO, | § | |
| FADED SMOKE SHOP, LLC, and | § | |
| DANIEL HERRERA, JR., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 6:23-CV-00014 |
| | § | |
| CITY OF PORT LAVACA, TEXAS, | § | |
| COLLIN RANGNOW, KYLE CURTIS, | § | |
| KAREN NEAL, ADAM BEARD, JAVIER | § | |
| RAMOS, MAXWELL DUKE, MARIA | § | |
| MORENO, DEVON MOORE, ERIC | § | |
| SALLES, and JUSTIN KLARE, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Alexandra Degollado opened Faded Smoke Shop, LLC ("Faded") in Port Lavaca, Texas, and started selling a wide range of hemp products. Shortly after opening the shop, she learned from customers that the police were investigating her, the business, and her employee, Daniel Herrera, Jr. Police officers had gone undercover as customers, bought some of Degollado's hemp products, and had them tested to determine whether they were the "legal" kind or not. Eventually, officers obtained a search-and-arrest warrant. With a warrant in hand, officers raided the shop, seized various hemp products, arrested Herrera, and arrested Degollado when she turned herself in two days after the raid. Police issued press releases, Facebook posts, and other statements describing the allegedly illegal activity of Degollado, Herrera, and Faded. Degollado and Herrera were indicted for possession with intent to distribute a controlled substance, but after about

eight months, their cases were dismissed. The Port Lavaca Police Department returned several of Degollado's items, except for around $14,000 worth of hemp products that Degollado alleges are legal.

Degollado, Herrera, and Faded sued on February 9, 2023, alleging various constitutional claims under 42 U.S.C. § 1983, along with several state-law claims. After the Court dismissed Plaintiffs' Original Complaint without prejudice, they amended it, asserting many of the same constitutional claims under Section 1983 and one state-law malicious-prosecution claim against Defendants. Defendants now move to dismiss the Amended Complaint under Rules 12(b)(1) and 12(b)(6), arguing that Plaintiffs' claims fail because of qualified immunity, immunity under the Texas Tort Claims Act, and purported pleading deficiencies. Plaintiffs have not responded. After careful review of the Motion, the record, and any applicable law, the Court finds that the Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint, (Dkt. No. 19), should be **GRANTED**.

## I.    BACKGROUND[1]

Before addressing the specific facts, it helps to understand the difference between hemp and marijuana, as well as the recent changes to the law governing them.

---

[1]    For purposes of addressing this Motion, the Court accepts all factual allegations in the operative complaint as true and views them in the light most favorable to the nonmovant. *See White v. U.S. Corrs., LLC,* 996 F.3d 302, 306–07 (5th Cir. 2021).

A.    Hemp and Marijuana Generally

Hemp and marijuana come from the same plant species, *Cannabis sativa L.*, but they are genetically distinct and differ in chemical composition and use.  Renée Johnson, *Defining* Hemp*: A Fact Sheet*, Congress.gov (Mar. 22, 2019), https://www.congress.gov/crs-product/R44742; *Cannabis (Marijuana)*, Nat'l Inst. on Drug Abuse (Sept. 24, 2024), https://nida.nih.gov/research-topics/cannabis-marijuana    [https://perma.cc/EPL7-9KNW].[2]

The cannabis plant contains a variety of natural chemical compounds known as cannabinoids, including tetrahydrocannabinol ("THC") and cannabidiol ("CBD").  *FDA and Cannabis: Research and Drug Approval Process*, U.S. Food & Drug Admin. (Feb. 24, 2023),    https://www.fda.gov/news-events/public-health-focus/fda-and-cannabis-research-and-drug-approval-process.  Delta-9 THC, the most abundant type of THC in cannabis, can temporarily alter a person's mood, thoughts, and perceptions.  Nat'l Inst. on Drug Abuse, *supra*.  CBD, on the other hand, is a nonintoxicating cannabinoid with no mind-altering effects.  *Id.*; *Cannabis and Public Health: About CBD*, Ctr. for Disease Control (Jan.   31,   2025),   https://www.cdc.gov/cannabis/about/about-cbd.html   [https://perma.cc/V6AK-7XXS].  It is commonly used to reduce anxiety, improve sleep, alleviate pain, and mitigate inflammation.  *See* Peter Grinspoon, *Cannabidiol (CBD): What We Know and  What  We  Don't*,  Harvard  Health  Publ'g  (Apr.  4,  2024),  https://www.

---

[2]    *See also Hemp Production Program Questions and Answers*, U.S. Dep't of Agric. (Apr. 25, 2022),  https://www.ams.usda.gov/rules-regulations/hemp/questions-and-answers [https://perma.cc/K5XV-7E64].

health.harvard.edu/blog/cannabidiol-cbd-what-we-know-and-what-we-dont-20180824
14476 [https://perma.cc/6VR3-QNBP].

While marijuana and hemp come from the same general plant species, the terms
are not interchangeable. Marijuana typically refers to cannabis grown to produce high
levels of THC (between 10–30%) and is a psychotropic drug for medicinal or recreational
purposes. Johnson, *supra*. Hemp is a variety of the cannabis plant grown to contain very
low, non-intoxicating amounts of Delta-9 THC (less than 0.3%) and is largely cultivated
for industrial products, dietary supplements, or CBD extraction. *Id.*; Nat'l Inst. on Drug
Abuse, *supra*; Ctr. For Disease Control, *supra*.

### B.    RECENT LEGAL CHANGES

Based on this distinction, Congress passed the Agriculture Improvement Act in
2018, which removed "hemp" from the definition of "marijuana" under the Controlled
Substances Act[3] and defined "hemp" as "the plant Cannabis sativa L. . . . with a [Delta-9
THC] concentration of not more than 0.3 percent."[4]

Following in the federal government's footsteps, Texas partially legalized hemp
and hemp-derived products.[5] Like the federal definition, *see* 7 U.S.C. § 1639o(1), Texas

---

[3]    Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 12619(a), 132 Stat. 4490,
5018 (2018) (codified at 21 U.S.C. § 802(16)(B)(i)).

[4]    Agriculture Improvement Act of 2018, Pub. L. No. 115-334, § 297A, 132 Stat. 4490, 4908
(2018) (codified at 7 U.S.C. § 1639(o)(1)).

[5]    *See* Act of June 10, 2019, 86th Leg., R.S., ch. 764, § 7, 2019 Tex. Gen. Laws 2085, 2099; *see
also* Tex. Health & Safety Code § 443.204(1) (stating that "hemp-derived cannabinoids, including
cannabidiol [CBD], are not considered controlled substances or adulterants"); Tex. Health &
Safety Code § 481.002(5) (excluding "hemp" from the definition of a "controlled substance"); Tex.
Health & Safety Code § 481.002(26) (excluding "hemp" from the definition of "marijuana").

defined "hemp" as "the plant Cannabis sativa L. and any part of that plant, including the seeds of the plant and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a [Delta-9 THC] concentration of not more than 0.3 percent."  Tex. Agric. Code § 121.001; *see also* 25 Tex. Admin. Code § 300.101(1) (defining the "acceptable hemp THC level" as a "[Delta-9 THC] content concentration level . . . that, when reported with the accredited laboratory's measurement of uncertainty, produces a distribution or range that includes a result of 0.3 percent or less").

## C.    RELEVANT FACTS

A year after Texas legalized hemp products with less than 0.3% Delta-9 THC, Degollado opened Faded Smoke Shop, LLC.  (Dkt. No. 18 at 4–5).  There, Degollado sold various hemp products, such as edible hemp, hemp gummies, vape cartridges, miniature syringes with THC distillate inside, CBD Pain Freeze, packs of hemp pre-rolls, and hemp K-cups.  (*Id.* at 5, 10).

After a few months, customers warned Degollado that the police were investigating her business.  (*Id.* at 5–6).  Degollado noticed that police cars would slowly drive by the shop or park in a Dairy Queen parking lot across the street from Faded.  (*Id.* at 6).

Unbeknownst to Degollado, around a month after Faded Smoke Shop opened, Defendant Corporal Kyle Curtis, a police officer with the Port Lavaca Police Department, went undercover as a customer.  (*See id.* at 6–7); (Dkt No. 8-1 at 50).  At one point in September 2020, Corporal Curtis entered Degollado's shop as an undercover customer and bought a glass jar with a faded logo and a green, "leafy substance" inside — a

substance that Corporal Curtis believed was marijuana.  (Dkt. No. 18 at 7); (Dkt. No. 18-1 at 50, 88–90, 92–93).  Corporal Curtis states that he took the substance to the police department for field testing, and the tests came back positive for marijuana.[6]  (Dkt. No. 18-1 at 50, 88).

In a second undercover buy a month later, Corporal Curtis bought "two syringes of THC Distillate," a bag of edible gummies, and "a jar of unknown edibles," which were all sent to the DPS Crime Lab for analysis.  (*Id.* at 50, 53, 86–87).  Two of the gummies tested positive for "THC."  (*Id.* at 50, 53).

These results led Corporal Curtis to complete and submit an affidavit for a search-and-arrest warrant to a magistrate judge on February 9, 2021.  (*Id.* at 50–51); (Dkt. No. 18 at 6–7).  That same day, the magistrate judge issued a search-and-arrest warrant for Faded, Degollado, and Herrera.  (Dkt. No. 18 at 9); (Dkt. No. 18-1 at 76).  Armed with the warrant, police officers entered the shop and seized several items: (1) $1,192.06 in cash from the register; (2) a cash-register drawer; (3) an Emerson TV; (4) a Samsung Tablet, Square Tile, and stand; (5) a cell phone; (6) a Blink Camera System; (7) documents; and (8) products from the store, including Strawberry Bites edibles, Cookies edibles, Bearly Legal edibles, a bag of unspecified gummies, vape cartridges, THC distillate in miniature syringes, Cake vape cartridges, CBD Pain Freeze, packs of hemp pre-rolls, hemp K-cups, hemp products, Choco Buds Moon Rocks, unspecified THC edibles, THC Moon Rocks,

---

[6]    While the product was allegedly also sent to the DPS Crime Lab for analysis, (Dkt. No. 18-1 at 50, 88), the results of that analysis are not in the record, (*see* Dkt. No. 18 at 7–8) (citing Dkt. No. 18-1 at 53).

and other "unspecified" items.  (Dkt. No. 18 at 10); (Dkt. No. 18-1 at 113–19); (Dkt. No. 18-2 at 1–88).  According to the Bexar County Criminal Investigation Laboratory Report, the items from this raid that were sent for laboratory testing all tested positive for "Delta-8 [THC]."  (Dtk. No. 18-1 at 79–80).

After the raid, Corporal Curtis, Defendant Lieutenant Javier Ramos, and Defendant Chief Collin Rangnow issued press releases, Facebook posts, and other statements describing the allegedly illegal activity of Degollado, Herrera, and Faded.  (*Id.* at 6); (Dkt. No. 18 at 12); (18-2 at 95–100).  Officers arrested Herrera on the day of the raid, and two days after, Degollado turned herself in at the Calhoun County Adult Detention Center, where she was arrested.  (Dkt. No. 18 at 10).

Ultimately, Degollado and Herrera were indicted for "knowingly possess[ing], with intent to deliver, a controlled substance, namely [THC] (Delta-8)."  (*Id.* at 11) (citing Dkt. No. 18-1 at 82–83).  About eight months later, however, the Criminal District Attorney moved to dismiss the cases against Herrera and Degollado because the police officers were "unavailable to testify due to a credibility issue."  (*Id.* at 12) (citing Dkt. No. 18-2 at 90).  After dismissal, Degollado sought to have her confiscated items returned.  (*Id.*).  The Port Lavaca Police Department returned her cash, her point-of-sale system, her gaming system, and several other items, but it did not return over $14,000 worth of hemp products that Degollado alleges were legal.  (*Id.*).

Because of this encounter, Degollado, Herrera, and Faded filed a lawsuit on February 9, 2023, alleging various constitutional claims under 42 U.S.C. § 1983 and

several state-law claims. (*See* Dkt. No. 1).[7] Defendants answered, (Dkt. No. 8), and moved to dismiss the Original Complaint, (Dkt. No. 9). The Court granted dismissal but allowed Plaintiffs to amend their Complaint. (Dkt. No. 17).

Plaintiffs did so and now allege that Defendants (1) unlawfully arrested Degollado; (2) unlawfully arrested Herrera; (3) unlawfully searched Faded and seized some of its products; (4) failed to intervene under the Fourteenth Amendment; (5) are subject to municipal liability under 42 U.S.C. § 1983; and (6) maliciously prosecuted Plaintiffs. (Dkt. No. 18 at 12–30). Defendants move to dismiss the Amended Complaint under Rules 12(b)(1) and 12(b)(6), arguing that Plaintiffs' claims fail because of qualified immunity, immunity under the Texas Tort Claims Act, and pleading deficiencies. (Dkt. No. 19). Plaintiffs have not responded.

## II.    LEGAL STANDARD

### A.    RULE 12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, defendants may move to dismiss for "lack of subject-matter jurisdiction." When considering a motion to dismiss under Rule 12(b)(1), a court must "accept the complaint's well-pleaded factual allegations as true." *Carver v. Atwood*, 18 F.4th 494, 496 (5th Cir. 2021). Dismissal for lack of subject-

---

[7] Plaintiffs' initial Complaint included twelve claims: (1) unlawful arrest of Degollado; (2) unlawful arrest of Herrera; (3) unlawful search of Faded Smoke Shop and seizure of its products; (4) failure to intervene under the Fourteenth Amendment; (5) municipal liability under 42 U.S.C. § 1983; (6) common-law false arrest of Degollado; (7) common-law false arrest of Herrera; (8) common-law intentional infliction of emotional distress as to Degollado; (9) common-law intentional infliction of emotional distress as to Herrera; (10) defamation of Degollado; (11) defamation of Herrera; and (12) equal protection violations under the Fifth and Fourteenth Amendments and the Texas Constitution. (*Id.* at 10–18).

matter jurisdiction is appropriate when the plaintiff does not "plausibly allege all jurisdictional elements." *Brownback v. King*, 592 U.S. 209, 217, 141 S.Ct. 740, 749, 209 L.Ed.2d 33 (2021); *Ghedi v. Mayorkas*, 16 F.4th 456, 463 (5th Cir. 2021). "For a 12(b)(1) motion, the general burden is on the party asserting jurisdiction." *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021).

"When a Rule 12(b)(1) motion is filed with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion 'before addressing any attack on the merits.'" *D&G Holdings, LLC v. Becerra*, 22 F.4th 470, 474 (5th Cir. 2022) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam)).

**B.    RULE 12(b)(6)**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendants may move to dismiss for "failure to state a claim upon which relief can be granted." Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

"[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than . . . 'labels and conclusions . . . .'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965). "The defendant, as the moving party, bears the burden of proving that no legally cognizable claim for relief exists." *Flores v. Morehead Dotts Rybak, Inc.*, No. 2:21-CV-00265, 2022 WL 4740076, at *2

(S.D. Tex. Sept. 29, 2022) (citing 5B Charles Alan Wright et al., *Federal Practice and Procedure* § 1357 (3d ed.)).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept the plaintiff's factual allegations as true and view those allegations in the light most favorable to the plaintiff. *White v. U.S. Corrs., LLC*, 996 F.3d 302, 306–07 (5th Cir. 2021). The court must evaluate whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965). "Dismissal . . . is appropriate where the plaintiff fails to allege 'enough facts to state a claim to relief that is plausible on its face' and thus does not 'raise a right to relief above the speculative level.'" *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. at 1965, 1974).

### C.    QUALIFIED IMMUNITY

Qualified immunity protects government officials from civil liability to the extent that their conduct is objectively reasonable in light of clearly established law. *Crostley v. Lamar County*, 717 F.3d 410, 422 (5th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The doctrine provides government

officials "'breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct. 1235, 1244, 182 L.Ed.2d 47 (2012)).

"When a defendant asserts a qualified immunity defense in a motion to dismiss, the district court must 'carefully scrutinize the complaint . . . because qualified immunity means immunity from having to stand trial, not simply immunity from monetary liability.'" *Blue Mint Pharmco, LLC v. Tex. State Bd. of Pharmacy*, 667 F.Supp.3d 473, 489 (S.D. Tex. 2023) (quoting *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021)). "The burden is on the plaintiff to demonstrate the inapplicability of the qualified immunity defense." *Id.* (citing *Kelson*, 1 F.4th at 416).

A plaintiff "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* (quoting *Kelson*, 1 F.4th at 416). This means that a plaintiff must show that (1) the official violated a statutory or constitutional right and (2) the right was so "clearly established" at the time of the challenged conduct that a reasonable officer would be on notice that their conduct was against the law. *Ramirez v. Killian*, 113 F.4th 415, 421 (5th Cir. 2024) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011)); *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) ("Officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants

charged with the criminal offense defined in 18 U.S.C. § 242."); *see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

## III.  DISCUSSION

Defendants broadly seek to dismiss Plaintiffs' state and federal claims.  (Dkt. No. 19 at 11–27).  The Court addresses their state-law claim before turning to the federal claims.

### A.  STATE CLAIM

Defendants first argue that Plaintiffs' state-law malicious-prosecution claim (1) falls outside the statute of limitations and (2) is barred by governmental immunity because the Texas Tort Claims Act does not waive immunity for intentional-tort claims. (*Id.* at 11–14).  The Court examines each argument in turn.

#### 1.  <u>Statute of Limitations</u>

To start, Defendants argue that Plaintiffs' malicious-prosecution claim is untimely. (*Id.* at 11, 14).  The Court disagrees.  In Texas, the statute of limitations for the tort of malicious prosecution is one year, Tex. Civ. Prac. & Rem. Code § 16.002(a), which begins to run "when the criminal prosecution ends," *Trusty v. Walmart Inc.*, No. 4:20-CV-00235, 2020 WL 2497733, at *2 (S.D. Tex. May 13, 2020) (first citing *Mead v. Prop. Owners' Ass'n of Teringua Ranch, Inc.*, 410 S.W. 3d 434, 438 (Tex. App.—El Paso 2013, no pet.); and then citing *Roehrs v. Conesys, Inc.*, 332 F.App'x 184, 189 (5th Cir. 2009) (per curiam)).

Here, the criminal prosecution ended when Degollado and Herrera's criminal cases were dismissed on August 16, 2022.  (Dkt. No. 18-2 at 90–91).  Plaintiffs amended their Complaint on March 28, 2024, (Dkt. No. 18)—more than one year after August 2022.

But that does not end the analysis. Under the relation-back doctrine, "'[w]hen an amended pleading "relates back" to the date of a timely filed original pleading,' it is 'thus itself timely even though it was filed outside an applicable statute of limitations.'" *Johnson v. Miller*, 126 F.4th 1020, 1026–27 (5th Cir. 2025) (quoting *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541, 130 S.Ct. 2485, 2489, 177 L.Ed.2d 48 (2010)). An amended pleading generally "relates back to the date of the original pleading" if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). This means that a new claim relates back when it "arise[s] from 'one episode-in-suit.'" *Johnson*, 126 F.4th at 1028 (quoting *Mayle v. Felix*, 545 U.S. 644, 660, 125 S.Ct. 2562, 2572, 162 L.Ed.2d 582 (2005)).

Plaintiffs' malicious-prosecution claim arises from the same set of facts as the claims included in their Original Complaint. (Dkt. No. 18 at 4–12, 27–30). And taking these factual allegations as true—as the Court must, *see White*, 996 F.3d at 306–07—these facts depict a single "episode" of conduct that Plaintiffs challenge, *see Johnson*, 126 F.4th at 1028. Indeed, the raid, criminal indictments, and news releases about Plaintiffs' activities constitute a single "episode" that gave rise to both the constitutional claims in Plaintiffs' original pleading and their malicious-prosecution claim here. *Compare* (Dkt. No. 1 at 4–13, 17–18) *with* (Dkt. No. 18 at 27–30). As a result, Plaintiffs' malicious-prosecution claim "relates back" to the original pleading. So, February 9, 2023, the date that Plaintiffs originally filed suit, is the proper date for the statute-of-limitations analysis.

And because February 9, 2023, is six months after the criminal prosecution ended, *compare* (Dkt. No. 1) *with* (Dkt. No. 18-2 at 90–91), Plaintiffs' malicious-prosecution claim is timely.

### 2.   Immunity Under the Texas Tort Claims Act

Defendants also contend that Plaintiffs' malicious-prosecution claim is barred under the Texas Tort Claims Act's ("TTCA") immunity provisions.  (Dkt. No. 19 at 11–14).   Broadly, sovereign immunity—and its derivative, governmental immunity—protects the State, state agencies, their officers, and political subdivisions from lawsuits by citizens.  *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 & n.2 (Tex. 2008) (citing *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006)); *Sherwinski v. Peterson*, 98 F.3d 849, 851 (5th Cir. 1996) ("[A]n unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." (citing *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974))).  This immunity is not invincible, though.  Sometimes, a State may consent or "voluntarily relinquish[]" its sovereign immunity through legislative enactments.  *See Mission Consol. Indep. Sch. Dist.*, 253 S.W.3d at 655.

Take Texas, for example.  Texas has waived immunity in a few instances under the TTCA,  *id.* (citing Tex. Civ. Prac. & Rem. Code § 101.023), including when "liability arises from the 'use of a motor-driven vehicle or motor-driven equipment' or from 'a condition or use of tangible personal or real property,'" *id.* at 655–56 (quoting Tex. Civ. Prac. & Rem. Code § 101.021).

But the TTCA's waiver of immunity is not boundless.  Relevant here, the TTCA has two limits.  First, the TTCA does not waive sovereign immunity for state-law

14

intentional torts.  Tex. Civ. Prac. & Rem. Code § 101.057(2) ("This chapter does not apply to a claim . . . arising out of . . . any other intentional tort . . . ."); *Aguirre v. City of San Antonio*, 995 F.3d 395, 422 (5th Cir. 2021) ("Section 101.021(2) of the TTCA 'waives governmental immunity for certain negligent conduct, but does not waive immunity for claims arising out of intentional torts.'" (quoting *City of Watauga v. Gordon*, 434 S.W.3d 586, 594 (Tex. 2014))).  Consequently, suits for intentional torts against governmental entities are typically barred, meaning that plaintiffs may sue only government employees in their individual capacities.

Second, the TTCA's election-of-remedies provision bars a plaintiff from suing both a governmental entity and its employees for the same conduct.  Tex. Civ. Prac. & Rem. Code § 101.106.  Under this provision, a plaintiff must choose "between suing a governmental unit and suing an employee of that unit."  *Bustos v. Martini Club Inc.*, 599 F.3d 458, 462 (5th Cir. 2010).  Indeed, if a plaintiff sues "both a governmental unit and any of its employees," subsection (e) states that "the employees shall immediately be dismissed on the filing of a motion by the governmental unit."  Tex. Civ. Prac. & Rem. Code § 101.106(e).  And because the election-of-remedies provision is a "jurisdictional statute," *Tex. Tech Univ. Health Scis. Ctr. v. Villagran*, 369 S.W.3d 523, 528 (Tex. App.— Amarillo 2012, pet. denied), it *mandates* the dismissal of all claims against the employees when triggered, regardless of whether those claims are brought in their official or

individual capacities,[8] *see* Tex. Civ. Prac. & Rem. Code § 101.106(e) (requiring dismissal of employees "[o]n the filing of a motion by the governmental unit" when both the entity and employees are sued); *see also Bustos*, 599 F.3d at 463 (holding Section 101.106 applies to state-law intentional-tort claims when they are "against a governmental unit and its employees."); *Gil Ramirez Grp., LLC v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 416 (5th Cir. 2015) ("[I]f a plaintiff brings virtually any state common law tort claim against both a governmental unit and its employees, § 101.106(e) will allow the employee defendants to be dismissed if the governmental unit so moves." (internal quotation marks omitted)); *Mission Consol. Indep. Sch. Dist.*, 253 S.W.3d at 658 (holding that the TTCA's election-of-remedies provision applies to intentional torts even though intentional torts fall outside the TTCA's waiver of immunity).

In practice, therefore, the election-of-remedies provision

> force[s] a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable, thereby reducing the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery.

---

[8]    While this structure may appear to leave citizens without recourse against the government for intentional torts, they may bring a state-law intentional-tort claim solely against government employees in their individual capacities. *See Huntsville Indep. Sch. Dist. v. Briggs*, 262 S.W.3d 390, 393 (Tex. App.—Waco 2008, pet. denied) (explaining that a plaintiff can choose to sue "a governmental employee acting as an individual *outside* the employee's official capacity" (emphasis added) (first citing *Waxahachie Indep. Sch. Dist. v. Johnson*, 181 S.W.3d 781, 785 (Tex. App.—Waco 2005, pet. denied); and then citing *Mission Consol. Indep. Sch. Dist.*, 253 S.W.3d at 656–57)). That claim would not trigger the election-of-remedies provision and would not be barred under the TTCA's intentional-tort provisions. But because Plaintiffs have not pursued that option here, the Court makes no finding on whether such a claim would be viable in this case.

*Mission Consol. Indep. Sch. Dist.*, 253 S.W.3d at 657 (footnote omitted).  The choice to sue a governmental unit is "irrevocable" and "forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter."  Tex. Civ. Prac. & Rem. Code § 101.106(e).

Based on these two limits, Defendants argue that (1) the election-of-remedies provisions of the TTCA require dismissal of the malicious-prosecution claim against the individual Defendants; and (2) the intentional-tort provisions require dismissal of Plaintiffs' malicious-prosecution claim against the City of Port Lavaca.  *See* Dkt. No. 19 at 11–14).  The Court agrees on both points.

        a.    <u>Election of remedies: Plaintiffs' claims against government employees</u>

The Court agrees that the TTCA's election-of-remedies provisions require that Plaintiffs' malicious-prosecution claim be dismissed as to the individual Defendants.

First, Plaintiffs' "suit is filed under" the TTCA because Plaintiffs seek relief for intentional torts.  *See Quinn v. Guerrero*, 863 F.3d 353, 362 (5th Cir. 2017) ("A suit asserting common law claims against a Texas governmental unit is considered to be under the TTCA." (cleaned up)); *Mission Consol. Indep. Sch. Dist.*, 253 S.W.3d at 658 (holding that a suit asserting intentional-tort claims is "filed under" the TTCA for election-of-remedies purposes).

Second, Plaintiffs' suit is filed "against both a governmental unit and . . . its employees."  Tex. Civ. Prac. & Rem. Code § 101.106(e).  Plaintiffs sued the City of Port Lavaca, (Dkt. No. 18 at 2), and under the TTCA, the definition of "governmental unit"

includes "any city," Tex. Civ. Prac. & Rem. Code § 101.001(3)(B).  Likewise, Plaintiffs sued

various employees of the City of Port Lavaca.  (Dkt. No. 18 at 2–3) (identifying several

individuals as "employed by the Defendant, City of Port Lavaca"); *see also* Tex. Civ. Prac.

& Rem. Code § 101.001(2) (defining "[e]mployee" as "a person, including an officer or

agent, who is in the paid service of a governmental unit by competent authority").

Plaintiffs have thus sued both "a governmental unit and . . . its employees."  Tex. Civ.

Prac. & Rem. Code § 101.106(e).

Therefore, Plaintiffs' suit falls under Section 101.106(e), *see id.*, and their state-law

claims against the individual Defendants "shall immediately be dismissed," *Bustillos v.*

*El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 223 (5th Cir. 2018); *accord Self v. City of Mansfield*,

369 F.Supp.3d 684, 704 (N.D. Tex. 2019).  This includes the state-law claims asserted

against the individual defendants in their official *and* individual capacities.  *See Tex. Bay*

*Cherry Hill, L.P. v. City of Fort Worth*, 257 S.W.3d 379, 401 (Tex. App.—Fort Worth 2008,

no pet.) ("[A] suit under the Tort Claims Act against a governmental unit bars a same-

subject-matter suit against an employee in *both* the employee's official and individual

capacities." (emphasis added)); *see also A.W. v. Humble Indep. Sch. Dist.*, 25 F.Supp.3d 973,

1007 (S.D. Tex. 2014) ("Although plaintiffs argue that the individual defendants are not

entitled to dismissal of state law claims 'where such claims involve the Individual

Defendants' conduct in their personal-capacity,' plaintiffs have not cited any authority

that accords different treatment to official and personal capacity tort claims asserted

against government employees under Texas law.  Moreover, plaintiffs' argument has

been rejected by a number of Texas intermediate courts." (collecting cases)).  Accordingly,

18

the Court dismisses Plaintiffs' state-law claim against the individual Defendants. Only Plaintiffs' state-law claim against the City of Port Lavaca remains.

              b.      <u>Intentional-tort immunity: Plaintiffs' claims against the City of Port Lavaca</u>

This Court agrees, however, that Plaintiffs' state-law claim against the City of Port Lavaca must also be dismissed. The TTCA does not waive governmental immunity for intentional torts, Tex. Civ. Prac. & Rem. Code § 101.057(2), and a malicious-prosecution claim is an intentional tort under Texas law, *see Baugh v. City of Port Lavaca*, No. 6:20-CV-00007, 2022 WL 980270, at \*9 (S.D. Tex. Mar. 30, 2022) (first citing *City of Hempstead v. Kmiec*, 902 S.W.2d 118, 122 (Tex. App.—Houston [1st Dist.] 1995, no writ); and then citing *Humphrey's v. City of Ganado*, 467 F.App'x 252, 256–57 (5th Cir. 2012) (per curiam)). Therefore, the TTCA bars this claim. *See Donohue v. Butts*, 516 S.W.3d 578, 581 (Tex. App.—San Antonio 2017, no pet.). Accordingly, the Court dismisses the malicious-prosecution claim against the City of Port Lavaca. *See Alcala v. Webb County*, 620 F.Supp.2d 795, 802 (S.D. Tex. 2009). Now, only Plaintiffs' federal claims remain.

**B.    FEDERAL CLAIMS**

Turning to the federal claims, Defendants seek to dismiss Plaintiffs' constitutional claims against the individual Defendants and the City of Port Lavaca. (Dkt. No. 19 at 14–27).

              1.      <u>**Federal Claims Against the Individual Defendants**</u>

As to Plaintiffs' claims against the individual officers, Defendants seek dismissal for two primary reasons: (1) the individual-capacity claims against the officers are barred by qualified immunity, (*id.* at 24–26); and (2) the official-capacity claims against the

officers are duplicative of the claims against the City of Port Lavaca and should therefore be dismissed, (*id.* at 27).[9]  The Court agrees.

### a.    Qualified immunity

To start, Defendants argue that Plaintiffs fail to satisfy either prong of the qualified-immunity analysis.  (*Id.* at 24–26).   Generally, "[c]ourts have discretion to decide which prong . . . to address first."  *Blue Mint Pharmco, LLC*, 667 F.Supp.3d at 489 (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)). Because the Court finds that Plaintiffs failed to meet the clearly established prong, its analysis begins (and ends) there.

"The 'clearly established' prong is difficult to satisfy."  *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020).  A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam)).  This standard is met only if "the state of the law at the time of the incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional."  *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (alteration in original) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014)).

---

[9]    Defendants also assert that Plaintiffs' constitutional claims against the individual Defendants suffer from factual deficiencies.  (*Id.* at 18–23).  But because the Court finds that dismissal is appropriate on qualified-immunity grounds, it need not determine whether Plaintiffs' constitutional claims against the individual Defendants are factually deficient.

Consequently, to show that a constitutional right was "clearly established," a plaintiff must identify precedent that "'squarely govern[s]' the specific facts at issue." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020) (quoting *Mullenix*, 577 U.S. at 15, 136 S.Ct. at 310). Courts must ask "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12, 136 S.Ct. at 308 (emphasis in original) (quoting *Ashcroft*, 563 U.S. at 742, 131 S.Ct. at 2084). This constitutional question must be framed "with specificity and granularity." *Cunningham*, 983 F.3d at 193 (quoting *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019)). In other words, a plaintiff generally must identify "a case in which an officer acting under similar circumstances was held to have violated the [Constitution]," and explain "why the case clearly proscribed the conduct of that individual officer." *Cope*, 3 F.4th at 205 (cleaned up) (quoting *Bartlett*, 981 F.3d at 345).

"While an exact case on point is not required," the specifics of the officers' violation must be "beyond debate." *Id.* (quoting *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020)). Specifically, "the right's contours [must be] sufficiently definite that any reasonable official in the officer's shoes would have understood that he was violating it." *Baker*, 68 F.4th at 245–46 (cleaned up) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014)). Broad, general propositions of law are not enough. *Cope*, 3 F.4th at 205; *Ashcroft*, 563 U.S. at 742, 131 S.Ct. at 2084 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.").

21

Plaintiffs allege that Defendants are not entitled to qualified immunity because, since Texas legalized cannabis products containing less than 0.3% THC, Defendants presumably knew that Plaintiffs' hemp products were legal. (*See* Dkt. No. 18 at 13–15, 18, 20–23). These allegations are insufficient. First, Plaintiffs cite only nonbinding caselaw from other circuits or jurisdictions that broadly explain what probable cause means or what counts as unreasonable. (*See id.* at 15, 18, 21–23, 25) (first citing *Ulrich v. Pope County*, 715 F.3d 1054 (8th Cir. 2013); then citing *Harris Cnty. Precinct Four Constable Dep't v. Grabowski*, 922 S.W.2d 954 (Tex. 1996); then citing *United States v. Nicholson*, 721 F.3d 1236 (10th Cir. 2013); and then citing *United States v. Lopez-Soto*, 205 F.3d 1101 (9th Cir. 2000)). That is not enough for the clearly established prong, especially when "a right can become clearly established either through cases that constitute *binding* authority or on the basis of a *consensus* of persuasive cases from other jurisdictions." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 339 (5th Cir. 2007) (emphasis added) (citing *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc)), *opinion withdrawn in part on reh'g*, 494 F.3d 516 (5th Cir. 2007); *see also Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (finding that courts "must be able to point to *controlling* authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity" (emphasis added) (footnotes and some internal quotation marks omitted) (quoting *Ashcroft*, 563 U.S. at 742, 131 S.Ct. at 2084)). Accordingly, Plaintiffs' broad propositions of law are not enough to overcome the qualified-immunity defense. *See Cope*, 3 F.4th at 205; *Ashcroft*, 563 U.S. at 742, 131 S.Ct. at 2084.

Second, caselaw in Texas cuts against Plaintiffs' allegations. Indeed, while "industrial hemp is now legal and may be indistinguishable from marijuana without a lab test, marijuana remains illegal, and the probable cause standard for police to detect it remains the same." *State v. Gonzales*, 676 S.W.3d 261, 268 (Tex. App.—Dallas 2023, no pet.). Thus, "[o]fficers are not required to be absolutely certain or have actual confirmation that a substance they believe to be marijuana is marijuana and not hemp." *Id.*; *see also Lewis v. State*, No. 01-09-00530-CR, 2010 WL 3450246, at *3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2010, no pet.) (mem. op.) ("[T]he U.S. Supreme Court has held that an officer need not have actual confirmation of the illegality of a substance in order to have probable cause." (citing *Texas v. Brown*, 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983))). The Texas Legislature has also made clear that the legalization of hemp should not impede the enforcement of laws regulating marijuana. *See* Tex. Agric. Code § 122.358(d) ("This subchapter does not limit or restrict a peace officer from enforcing to the fullest extent the laws of this state regulating marihuana and controlled substances, as defined by Section 481.002, Health and Safety Code.").

Therefore, while "[a] consensus of authority in other circuits *may* 'clearly establish' a right even absent binding precedent by the Supreme Court or the Fifth Circuit," *In re Foust*, 310 F.3d 849, 861 n.13 (5th Cir. 2002) (emphasis added) (citing *McClendon*, 305 F.3d at 328–29), Plaintiffs have not managed to show "a 'robust consensus of persuasive authority,'" *Ashcroft*, 563 U.S. at 742, 131 S.Ct. at 2084) (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 1700, 143 L.Ed.2d 818 (1999)).

As a result, Plaintiffs have not shown that the law governing the individual Defendants' actions was "beyond debate." *Cope*, 3 F.4th at 205 (quoting *Baldwin*, 964 F.3d at 326). Plaintiffs' constitutional claims against the individual Defendants in their individual capacities are therefore dismissed on qualified-immunity grounds.

### b.    Redundancy

Apart from the individual-capacity claims, Defendants also argue that Plaintiffs' official-capacity claims against the officers are duplicative of the claims against the City of Port Lavaca. (Dkt. No. 19 at 27). The Court agrees. Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. N.Y. City Dep't. of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 2035 n.55, 56 L.Ed.2d 611 (1978). Thus, an official-capacity claim against an individual and a claim against the governmental unit are one and the same. *Graham v. Hodge*, 619 F.App'x 394, 395 (5th Cir. 2015) (per curiam) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985)). Because Plaintiffs' official-capacity claims against the individual Defendants are one and the same with their claims against the City of Port Lavaca, the Court treats them as an alternative way of pleading the municipal-liability claim and addresses Plaintiffs' municipal-liability claim next.

### 2.    Federal Claims Against the City of Port Lavaca

Defendants argue that the municipal-liability claim suffers from fatal pleading deficiencies. (Dkt. No. 19 at 14–18). The Court agrees.

Generally, "[m]unicipalities . . . cannot be found liable on a theory of vicarious liability or respondeat superior." *Davidson*, 848 F.3d at 395; *see also Monell*, 436 U.S. at 692,

98 S.Ct. at 2036. Instead, the municipality itself must have caused the violation. *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018) (citing *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36). For a municipal-liability claim under Section 1983, a plaintiff "must plead facts that plausibly establish that '(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.'" *St. Maron Props., LLC v. City of Houston*, 78 F.4th 754, 760 (5th Cir. 2023) (first quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018); and then citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38).

Plaintiffs' allegations fail at step one: proving an official policy. A plaintiff generally has three ways to establish an official policy: (1) submitting "written policy statements, ordinances, or regulations"; (2) showing "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy"; or (3) alleging "a single decision" by "the official or entity possessing final policymaking authority for an action" when the official or entity "performed the specific act that forms the basis of the § 1983 claim." *Id.* (citing *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214–15 (5th Cir. 2019)). Plaintiffs have not alleged the existence of a written policy, ordinance, or regulation. (*See* Dkt. No. 18 at 23–27). Nor have Plaintiffs alleged a widespread practice or custom. (*See id.*). Plaintiffs must therefore show that a single decision is enough here.

Under this single-incident exception, "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983." *Bd.*

*of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 406, 117 S.Ct. 1382, 1389, 137 L.Ed.2d 626 (1997) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986)).   This exception "requires the '*deliberate* choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question*.'"   *Webb*, 925 F.3d at 215 (emphasis in original) (quoting *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1300).   As a result, "the 'critical question' is generally 'to decide who is the final policymaker, which is an issue of state law.'"   *Id.*   (quoting *Advanced Tech. Bldg. Sols., LLC v. City of Jackson*, 817 F.3d 163, 166 (5th Cir. 2016)).

Plaintiffs allege that Police Chief Collin Rangnow is the final policy-maker here. (Dkt. No. 18 at 23–27).   That theory fails.   For one, Plaintiffs do not allege that Chief Rangnow is responsible for establishing any policy.   (*See id.*).   Plaintiffs only claim that "Chief Rangnow fully and completely controlled the *execution* of the *Franks* violation" and the warrant at issue and that Chief Rangnow directed the press conferences, news reports, and handling of evidence.   (*Id.* at 24) (emphasis added).   Plaintiffs allege that Chief Rangnow did not return some products that were seized from Plaintiffs' store, and it is these "'edicts and acts' of policy, custom, or practice [that] were the direct, proximate cause of [the individual Defendants] violating Plaintiffs['] . . . Fourth and Fourteenth Amendment rights."   (*Id.* at 26).   But these allegations don't show any policy that Chief Rangnow made; they only show his decision-making.   In fact, while "[a] true policymaker must 'decide the goals for a particular city function and devise the means of achieving those goals,'" *Webb*, 925 F.3d at 217 (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th

Cir. 1984)), Plaintiffs don't allege any goals that Chief Rangnow had.  Consequently, Chief Rangnow only has decision-making authority, not policy-making authority, and decision-making authority does not equal policy-making authority in the municipal-liability context.  *Id.* ("This argument conflates policymaking authority with decision-making authority, something our caselaw counsels against." (citing cases)).

What's more, the City Charter for the City of Port Lavaca suggests that Chief Rangnow is not the *final* policy-maker because he does not have the final say.  For instance, the City Charter states that the City Manager "shall be the chief administrative *and executive* officer of the City," while the Chief of Police is only the "the chief *administrative* officer of the Department of Police" who "shall perform such duties as may be required of him/her by ordinance and the City Manager."  Port Lavaca, Texas, Code of Ordinances, pt. I, art. 6, § 6.01, (2024) (emphasis added).  And when a city charter indicates that the chief of police is under the supervision of the city manager, district courts within the Fifth Circuit have consistently held that police chiefs are not final policy-makers, even though they may be decision-makers.  *See, e.g.*, *Villarreal v. City of Laredo*, No. 5:19-CV-00048, 2020 WL 13517246, at *30 n.20 (S.D. Tex. May 8, 2020) (finding that police chief was not final policy-maker when city charter placed policy-making authority with city council), *aff'd in part, rev'd in part and remanded*, 17 F.4th 532 (5th Cir. 2021); *Pinedo v. City of Dallas*, No. 3:14-CV-00958, 2015 WL 221085, at *5 (N.D. Tex. Jan. 15, 2015) (concluding that city charter "demonstrates that the Chief of Police is not the final policymaker for the Dallas Police Department because he is at all times subject to the rules and supervision of the City Manager"); *Mosser v. Haney*, No. 3:03-CV-02260, 2005 WL

1421440, at *4 (N.D. Tex. June 17, 2005) ("Thus, the Chief of Police is not the policymaker for Dallas's police department, as he remains subject to the rules and supervision of the City Manager.").

Therefore, "while the Chief of Police may be a decisionmaker, he is not the City's *final* policymaker for purposes of municipal liability." *Villarreal*, 2020 WL 13517246, at *30 (emphasis in original). So, even after amending their Complaint, Plaintiffs fail to allege a municipal-liability claim under Section 1983. Plaintiffs' *Monell* claim against the City of Port Lavaca is dismissed.

## IV.    CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, (Dkt. No. 19), and **DISMISSES WITH PREJUDICE** Plaintiffs' claims.

It is SO ORDERED.

Signed on March 31, 2025.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

28